62 F.3d 1426
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Gilberto SILVAS-NORZAGARAY, Defendant-Appellant.
 No. 94-10277.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted June 13, 1995.
Decided Aug. 2, 1995.
 
 Before: HUG, ALARCON, and TROTT, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Gilberto Silvas-Norzagaray ("Silvas") appeals from the judgment of conviction and the sentence imposed by the district court for the crime of conspiring to possess and distribute marijuana. Silvas seeks reversal of his judgment of conviction on the following grounds: 1) the evidence was insufficient to support a judgment of conviction for the crime of conspiracy; 2) there was a prejudicial variance between the charges in the indictment and the proof proffered at trial; and 3) the Government engaged in prosecutorial misconduct by presenting a witness who testified falsely at trial. Silvas also contends that the district court erred in: 1) calculating his base offense level; 2) enhancing his sentence by four points based on his role in the conspiracy; and 3) assessing the amount to be forfeited.
 
 
 3
 We affirm because we conclude that none of these claims of error is meritorious.
 
 I.
 
 4
 Silvas maintains that the evidence was insufficient to demonstrate that he was a member of a conspiracy. We review the sufficiency of the evidence "in the light most favorable to the Government, and [must] reverse for insufficiency only if no rational trier of fact could have found the elements of the charged offense beyond a reasonable doubt." United States v. Mesa-Farias, 53 F.3d 258, 259 (9th Cir.1995) (citations omitted). To prove a conspiracy, the Government must establish: "1) an agreement to accomplish an illegal objective; and 2) the requisite intent necessary to commit the underlying substantive offense." Id.
 
 
 5
 Silvas and his wife were co-owners of a residence located at 1602 West Riverview Boulevard ("West Riverview residence") in Tucson. Andres Chavarria, Sr. rented the house from Silvas' wife.
 
 
 6
 On February 24, 1990, Drug Enforcement Administration ("DEA") agents served a search warrant on the West Riverview residence. The agents seized drug paraphernalia including: a triple-beam scale, wrapping paper that is frequently used to package marijuana, a screen used for sifting marijuana, marijuana debris, and drug ledgers. The evidence at trial demonstrated that Andres Chavarria Jr. made the entries in the drug ledgers. He and his father, Andres Chavarria Sr., were charged with drug trafficking. They were promised reduced sentences in exchange for testifying against Silvas.
 
 
 7
 At trial, Andres Chavarria Sr. testified that he had entered into an agreement with Silvas approximately one year prior to the search of the West Riverview residence. Andres Chavarria Sr. agreed to receive and store marijuana for Silvas at the West Riverview residence until it was sold. Andres Chavarria Sr. testified that sometimes the marijuana would just "show up." At other times, Silvas would notify him that a shipment was on the way. With the aid of his son, Andres Chavarria Jr., Andres Chavarria Sr. kept records of each of the marijuana transactions. Andres Chavarria Sr. testified that sometimes Silvas would call and instruct him regarding the entry that should be made in the drug ledgers. Andres Chavarria Sr. also stated that he collected money for Silvas from the marijuana sales.
 
 
 8
 During the conspiracy phase of the trial, Andres Chavarria Jr. identified exhibit 2 and portions of exhibit 3 as pages of the drug ledgers that he had prepared at his father's request. The district court admitted these exhibits for the truth of the matter asserted. Silvas did not object to their admission for the truth of the matter asserted after Andres Chavarria Jr.'s testimony.[1] He does not challenge their admissibility on appeal.
 
 
 9
 Exhibit 2 and the pertinent pages of exhibit 3 contain the following notations:
 
 
 10
 Paid Gil 12,000 12-5-89;
 Paid Gil 30,000 12-20-89;
 Paid Gil 16,000 12-22-89;
 Paid Gil 2,000 12-26-89;
 Paid Gil 5,000 12-30-89;
 Paid Gil 50,000 1-7-90;
 Paid Gil 10,000 1-3-90;
 Paid Gil 10,000 1-5-90;
 Paid Gil 19,500 1-17-90;
 Paid Gil 20,000 1-24-90;
 Paid Gil 70,000 1-10-90;
 Paid Gil 100,000 2-5-90;
 Paid Gil 70,000 2-5-90;
 Paid Gil 35,000 2-5-90;
 Paid Gil 1,400 2-5-90;
 
 
 11
 Andres Chavarria Sr. testified that the name "Gil" referred to Silvas.
 
 
 12
 The evidence introduced by the Government demonstrated that Silvas intentionally entered into an agreement to distribute marijuana in violation of federal law. This evidence was sufficient to persuade a rational trier of fact beyond a reasonable doubt that Silvas conspired to possess and distribute marijuana. Mesa-Farias, 53 F.3d at 259.
 
 II.
 
 13
 Silvas contends that there was no evidence to corroborate Andres Chavarria Sr.'s testimony regarding Silvas' role in the conspiracy. Silvas appears to argue that a conviction cannot be sustained if it is based solely on the uncorroborated testimony of an accomplice. This notion is contrary to the law of this circuit.
 
 
 14
 "The uncorroborated testimony of an accomplice is enough to sustain a conviction unless the testimony is incredible or unsubstantial on its face." United States v. Lopez, 803 F.2d 969, 973 (9th Cir.1986), cert. denied, 481 U.S. 1030 (1987) (citations omitted). This rule also applies to the uncorroborated testimony of an accomplice in a conspiracy trial. United States v. Leung, 35 F.3d 1402, 1405 (9th Cir.1994), cert. denied, 115 S.Ct. 954 (1995). The fact that the testimony may have been given by an untrustworthy witness or that it was contradicted does not make the testimony untrustworthy. Lopez, 803 F.2d at 973.
 
 
 15
 We have stated that "when a jury is informed of the possible challenges to a witness' credibility and nevertheless believes the witness, the reviewing court should not upset the jury's credibility determination." Leung, 35 F.3d at 1405 (citations omitted). In this case, Silvas had the opportunity to cross-examine Andres Chavarria Sr., to challenge his credibility, and to argue the inconsistencies in his testimony. Accordingly, Andres Chavarria Sr.'s uncorroborated testimony is sufficient to sustain the judgment of conviction.
 
 III.
 
 16
 Silvas asserts that the district court erred in admitting Andres Chavarria Sr.'s testimony because it was inadmissible hearsay. Silvas appears to have confused the distinction between the admissibility of an accomplice's uncorroborated testimony regarding facts that he or she perceived, and the admissibility of a co-conspirator's extrajudicial statements.
 
 
 17
 As discussed above, the testimony of an accomplice is sufficient to prove each element of a crime, including conspiracy. Leung, 35 F.3d at 1405; Lopez, 803 F.2d at 973. In contrast, the extrajudicial statements of a co-conspirator are admissible only if they fall within Rule 801(d)(2)(E). Bourjaily v. United States, 483 U.S. 171, 175 (1987) (citations omitted); United States v. Silverman, 861 F.2d 571, 576 (9th Cir.1988).
 
 
 18
 Silvas failed to raise an issue concerning the admissibility of any extrajudicial statements in his opening brief. "We 'will not ordinarily consider matters on appeal that are not specifically and distinctly argued in the appellant's opening brief.' " In re Riverside-Linden Inv. Co., 945 F.2d 320, 324 (9th Cir.1991) (citations omitted). There are three exceptions to this rule: 1) if good cause is shown; 2) if the issue was raised in the Government's brief; or 3) if the Government would not suffer prejudice. United States v. Ullah, 976 F.2d 509, 514 (9th Cir.1992). Silvas has not demonstrated that any of these exceptions apply. By failing to raise this issue until his reply brief, Silvas did not permit it to be "fully explored." In re Riverside-Linden Inv. Co., 945 F.2d at 325. Accordingly, we decline to consider this issue.
 
 IV.
 
 19
 Silvas maintains that there was a prejudicial variance between the charges in the indictment and the evidence produced at trial. " '[I]f the indictment charges jointly tried defendants with participation in a single conspiracy, but the evidence reveals multiple, discrete conspiracies, such a variance of proof may be so prejudicial as to require reversal.' " United States v. Martin, 4 F.3d 757, 759 (9th Cir.1993) (citations omitted) (emphasis added). "The question of whether a single conspiracy has been proved, rather than multiple conspiracies ... is essentially a question of the sufficiency of the evidence." Id. (citations omitted). Therefore, the inquiry is " 'whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " Id. (citations omitted).
 
 
 20
 To determine whether reversal is required, we must engage in a two step inquiry: was there a variance, and if so, was it prejudicial. United States v. Kenny, 645 F.2d 1323, 1334 (9th Cir.), cert. denied, 452 U.S. 920 (1981). Prejudice may result in three ways: "1) inadequate opportunity to prepare a defense and exposure to unanticipated evidence at trial; 2) deprivation of the right to be tried only on charges presented in an indictment returned by the grand jury; and 3) exposure to prejudicial evidentiary spillover." United States v. Morse, 785 F.2d 771, 775 (9th Cir.), cert. denied, 476 U.S. 1186 (1986). The Supreme Court has defined evidentiary spillover as the "transference of guilt" from one defendant to another. Kotteakos v. United States, 328 U.S. 750, 774 (1946).
 
 
 21
 Silvas' contention that he was subjected to a prejudicial variance lacks merit. Silvas was tried alone. In United States v. Anguiano, 873 F.2d 1314 (9th Cir.), cert. denied, 493 U.S. 969 (1989), we stated that "there is no problem of spillover when, as in this case, the defendant stands trial alone." Id. at 1318 (citations omitted) (emphasis added).
 
 
 22
 Even though he was tried alone, Silvas maintains that he was subjected to a prejudicial variance on the following grounds. Silvas asserts that evidence of crimes committed by others was presented during the testimony of Andres Chavarria Sr., and Lieutenant Wesley Hand, of the South Tucson Police Department. Silvas further contends that the jury's forfeiture verdict demonstrates that he was found guilty of "either a larger conspiracy or for multiple conspiracies, for which there was no admissible evidence," because the jury improperly considered notations contained in drug ledgers that were admitted for the limited purpose of establishing the nature and use of the West Riverview residence, Silvas' contentions are unpersuasive.
 
 
 23
 According to Silvas, Andres Chavarria Sr. was involved in other conspiracies, in which Silvas took no part. Silvas bases his assertion on the fact that when Andres Chavarria Sr. was questioned regarding exhibit 2, he failed to link any of the individuals named therein to Silvas. Silvas also contends that Lt. Hand testified regarding a conspiracy between Andres Chavarria Sr. and an individual identified as "GONZ." Silvas mischaracterizes the testimony of Andres Chavarria Sr. and Lt. Hand. Andres Chavarria Sr. not only failed to link the individuals named in exhibit 2 to Silvas, he also failed to acknowledge that he knew any of those individuals. Further, Lt. Hand merely stated that the notations contained in exhibit 2 indicated that "GONZ" received marijuana at a certain price on a certain date. Lt. Hand did not testify regarding any separate conspiracy between Andres Chavarria Sr. and any other individual.
 
 
 24
 Before each drug ledger was admitted into evidence, the court instructed the jury that these documents could be considered only for the limited purpose of establishing the nature of the West Riverview residence.[2] In United States v. Jaramillo-Suarez, 950 F.2d 1378 (9th Cir.1991), the district court admonished the jury in a similar manner by stating that a drug related document could be considered "for the limited purpose of showing the character and use of the place where it was found and not for the truth of any matters asserted." Id. at 1384. Juries are generally presumed to follow instructions. United States v. Enriquez-Estrada, 999 F.2d 1355, 1360 (9th Cir.1993). Accordingly, in Jaramillo-Suarez and Enriquez-Estrada, we held that a limiting instruction, such as the one given in this case, adequately guards against the risk that the jury might erroneously rely on limited use documents for the truth of the matter asserted. Jarmillo-Suarez, 950 F.2d at 1383-84; Enriquez-Estrada, 999 F.2d at 1360.
 
 
 25
 A finding of multiple conspiracies requires some evidence that there were separate agreements and separate purposes. United States v. Taren-Palma, 997 F.2d 525, 530 (9th Cir.1993), cert. denied, 114 S.Ct. 1648 (1994). Silvas has failed to demonstrate that evidence of multiple conspiracies was presented to the jury.
 
 
 26
 Silvas further maintains that he was subject to a prejudicial variance because he was found guilty of conspiring to possess and distribute 1,000 pounds of marijuana, even though he was charged with conspiring to possess and distribute 5,000 pounds. We disagree.
 
 
 27
 A variance between the amount of drugs charged in the indictment and the amount the defendant is found responsible for at trial does not establish prejudicial variance. United States v. LeMaux, 994 F.2d 684, 690 (9th Cir.1993). As long as the indictment was "sufficiently explicit to inform [the defendant] of the charges against him[,]" there is no prejudicial variance. Id.; see also United States v. Hazeem, 679 F.2d 770, 773 (9th Cir.), cert. denied, 459 U.S. 848 (1982) (even if there was a variance between the amount of money that the defendant allegedly embezzled and the amount for which the defendant was ultimately found guilty, no prejudice existed because the indictment was sufficiently explicit to inform the defendant of the charges against him).
 
 V.
 
 28
 For the first time in his reply brief, Silvas asserted that the district court erred in giving a multiple conspiracy instruction and an instruction that explained the distinction between profits and gross sales during trial. Silvas did not raise this issue in his opening brief and he has not offered any justification for his failure to do so. Thus, Silvas has waived his objections to these jury instructions on appeal. See Ullah, 976 F.2d at 514.
 
 VI.
 
 29
 Silvas contends that his judgment of conviction must be reversed because the Government engaged in prosecutorial misconduct. Silvas maintains that Andres Chavarria Sr. and Andres Chavarria Jr. allegedly committed perjury "on the stand at the grand jury level and/or at trial, which misconduct resulted in the admission of prejudicial, false and misleading testimony before the jury, and the prosecution knew or should have known the result of the testimony."
 
 
 30
 "A conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the outcome of the trial." United States v. Necoechea, 986 F.2d 1273, 1281 (9th Cir.1993). Silvas' assertion is not supported by the record. He has failed to demonstrate that the prosecutor knowingly offered perjured testimony at trial. Id.; United States v. Sherlock, 962 F.2d 1349, 1364 (9th Cir.1989), cert. denied, 113 S.Ct. 419 (1992).
 
 VII.
 
 31
 Silvas also maintains the Government engaged in prosecutorial misconduct based upon his assertion that the Chavarrias were acting "as government agents during the period of their cooperation ... [because] [i]t is clear that the indictment was the result of Jr.'s and Sr.'s allegations." Silvas has failed to cite any authority for the proposition that if a Government witness commits perjury, the prosecutor is guilty of misconduct, even if he or she had no prior knowledge that the witness would testify falsely. Furthermore, Silvas has failed to establish that the Chavarrias were government agents. See United States v. Restrepo, 930 F.2d 705, 712-13 (9th Cir.1991) (a witness does not become a government agent merely because he or she testifies before the Grand Jury or because the witness expects to be rewarded for his or her cooperation).
 
 VIII.
 
 32
 Silvas contends that the district court erred in finding him guilty of conspiring to distribute 1,000 pounds of marijuana. "[T]he district court's factual determinations [are reviewed] for clear error and its legal interpretations of the Guidelines [are reviewed] de novo." United States v. Castaneda, 9 F.3d 761, 769 (9th Cir.1993), cert. denied, 114 S.Ct. 1564 (1994). Under this standard, an appellate court is "bound to accept a lower court's finding of fact unless [it has] a definite and firm conviction that a mistake has been committed." United States v. Ramos, 923 F.2d 1346, 1356 (9th Cir.1991).
 
 
 33
 The district court found that Silvas was responsible for 1,000 pounds of marijuana, based upon the following portion of Andres Chavarria Sr.'s trial testimony:
 
 
 34
 Q. [By Jesse Figueroa, Assistant United States Attorney] Do you ever recall telling the officers that you got paid a minimum of $25.00 per pound that went through your house?
 
 
 35
 A. [Andres Chavarria Sr.] Maybe I did. I can't remember if I did or not. That's a long time ago.
 
 
 36
 Q. And are you pretty good with arithmetic?
 
 
 37
 A. No.
 
 
 38
 Q. Would you agree with me that at least a thousand pounds went through that house?
 
 
 39
 A. Maybe so.
 
 
 40
 Further, the following colloquy occurred during Andres Chavarria Sr.'s appearance before the Grand Jury:
 
 
 41
 Q. Now, how would you know that a load of marijuana was going to be delivered to you?
 
 
 42
 A. He would get hold of me or call me.
 
 
 43
 Q. Who's "he?"
 
 
 44
 A. Silvas. Or he would call me and give me a day. Sometimes we would wait three days waiting for the load to show up, maybe a week.
 
 
 45
 Q. How many times would you get a load in a week?
 
 
 46
 A. Maybe once a week, maybe once every two weeks.
 
 
 47
 Q. How much marijuana would be delivered to you?
 
 
 48
 A. Oh, from 50 to 100 pounds at a time.
 
 
 49
 ....
 
 
 50
 Q. Now, who would deliver the marijuana to you?
 
 
 51
 A. Well, Allen Throssell, about the only man I got to know by name and maybe a couple of other Indian ladies. If I would see them, I wouldn't recognize them because they all look the same to me.
 
 
 52
 Q. How many shipments did you receive from Allen Throssell?
 
 
 53
 A. Oh, I can't be accurate on it. I can't be too accurate on it, you know. Maybe 10.
 
 
 54
 Q. 10 over the entire time that you were at the Riverview address?
 
 
 55
 A. 10, 15. I wouldn't keep track of them. I would just take them and turn them loose. 10, 15, maybe more.
 
 
 56
 (emphasis added).
 
 
 57
 During the sentencing proceedings, Silvas' counsel essentially conceded that Silvas was responsible for up to 1,000 pounds of marijuana as reflected in the following statement:
 
 
 58
 I don't totally disagree with the assessment that you made, Judge, because I have also included in here a copy of [Andres Chavarria Sr.'s] transcript where he testified under oath before the Grand Jury, and he told the Grand Jury that he was probably [sic] about ten loads from 50 to 100 pounds; and that in my memorandum I very clearly told the Court that it could be 500 or it could be a thousand--I am sorry--1500, because if you multiply ten times 50 per load, it is 500. If you multiply that times a hundred times ten, it is a thousand. So it is a range of 500 to 1,000 is a range that we could work with.
 
 
 59
 Based upon the evidence presented at trial and Andres Chavarria Sr.'s grand jury testimony, the district court did not clearly err in finding that Silvas was responsible for conspiring to possess and distribute 1,000 pounds of marijuana. Ramos, 923 F.2d at 1356.
 
 IX.
 
 60
 Silvas maintains that the district court erred in enhancing his sentence by four points due to his role in the conspiracy. Section 3B1.1(a) of the United States Sentencing Guidelines states that: "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive,[3] increase by 4 levels." U.S.S.G. Sec. 3B1.1 (1993) (emphasis added). "A defendant's role in a conspiracy is a question of fact reviewed for clear error." United States v. Roberts, 5 F.3d 365, 371 (9th Cir.1993). To determine whether a person is an "organizer or leader," we examine the following factors:
 
 
 61
 [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the alleged illegal activity, and the degree of control and authority exercised over others.
 
 
 62
 U.S.S.G. Sec. 3B1.1, comment. (n. 4).
 
 
 63
 As a threshold matter, Silvas argues that we must remand for resentencing because the district court failed to comply with Rule 32 of the Federal Rules of Criminal Procedure. Silvas' sentencing memorandum contains the following objection to the four-point enhancement recommended in the presentence report ("PSR"):
 
 
 64
 There is insufficient evidence before this court to find that Mr. Silvas organized or controlled others in a criminal organization which involved five or more participants. First, there is insufficient evidence to establish which five individuals were criminal participants with Defendant. Second, there is insufficient evidence that he controlled or directed other participants. Finally, ownership of the stash house in and of itself cannot account for a leadership role.
 
 
 65
 On appeal, Silvas contends that the district court did not make "findings of fact on the issue of the challenged number of participants."
 
 
 66
 Silvas has failed to raise a valid objection to his sentence under Rule 32. Silvas did not challenge the factual accuracy of any information contained in the PSR. See United States v. Fernandez-Angulo, 897 F.2d 1514, 1516 (9th Cir.1990) (en banc) (emphasis added) ("[W]hen the defendant challenges the factual accuracy of any matters contained in the presentence report, the district court must, at the time of sentencing, make the findings or determinations required by Rule 32."). Instead, he contended that the evidence was insufficient to support the probation officer's conclusion that Silvas was the organizer of 5 or more persons. The district court was not required to make any findings regarding historical facts because none were in dispute. United States v. Williams, 41 F.3d 496, 498-99 (1994).
 
 
 67
 Silvas also claims that there was insufficient evidence to support the district court's decision to enhance the base offense level due to his role in the offense. We disagree.
 
 
 68
 Section 3B1.1(a) of the United States Sentencing Guidelines provides that a defendant's sentence should be increased if he or she "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." We are persuaded from reviewing the evidence presented during the trial, as well as facts contained in the PSR, that the district court did not err in concluding that the conspiracy was "otherwise extensive" to warrant the four point enhancement. See, e.g., United States v. Hinton, 31 F.3d 817, 826 (9th Cir.1994) cert. denied, 115 S.Ct. 773 (1995) (a sentencing court can consider all of the testimony and evidence presented at trial to determine the defendant's sentence).
 
 
 69
 During trial, Andres Chavarria Sr. testified that for approximately one year he received and stored marijuana for Silvas. DEA Agent Timothy Bartels and Immigration and Naturalization Service ("INS") Agent Mike Connety interviewed the Chavarrias regarding Silvas' drug trafficking organization. The Chavarrias identified fifteen individuals, including themselves, who were involved with Silvas' marijuana smuggling and distribution operation. Drug ledgers obtained from the West Riverview residence demonstrate that over 5,000 pounds (2,268 kilograms) of marijuana was distributed from that location. These ledgers contain detailed information regarding: 1) the names of the individuals purchasing the marijuana; 2) the quantity of the marijuana purchased; 3) the price per pound of the marijuana; and 4) the "grade" of marijuana purchased. The ledgers also indicate that Silvas received $65,000 in 1989, and $385,900 in 1990, from the sale of marijuana.
 
 
 70
 The PSR states that Al Throssell personally delivered about 50 loads of marijuana, each averaging 100 pounds, to the West Riverview residence for Silvas. Throssell received over $300,000 for his deliveries to the West Riverview residence. He retrieved marijuana from locations on Indian lands that were prearranged by Silvas. Throssell delivered the marijuana to one of three "stash" houses operated by Silvas.
 
 
 71
 In Leung, 35 F.3d 1402, we held that a conspiracy, which involved 55.74 kilograms of cocaine and numerous individuals, who were not directly involved with the conspiracy, was sufficient for the district court to find it was "otherwise extensive" within the meaning of section 3B1.1. Id. at 1406-07. The conspiracy in this matter operated for approximately one year. Numerous individuals were directly involved with the conspiracy by delivering marijuana to the West Riverview residence, totaling approximately 5,000 pounds. Additionally, the record shows that Throssell received help from other persons in transporting the marijuana from the Indian lands to his ranch. Therefore, there was sufficient evidence for the district court to enhance Silvas' sentence due to his leadership role in the conspiracy.
 
 
 72
 Silvas asserts that ownership of the West Riverview residence alone is insufficient to warrant a four-point enhancement based on an otherwise extensive distribution enterprise. To support this proposition, Silvas cites United States v. Mares-Molina, 913 F.2d 770, 773 (9th Cir.1990). Silvas' reliance on Mares-Molina is misplaced.
 
 
 73
 In Mares-Molina, the defendant ran a trucking business. Id. at 772. He knew that his warehouse was used to store cocaine. Id. We held that the defendant's ownership of the trucking warehouse and knowledge that it was used to store drugs was not sufficient to find that he was an organizer or leader of the conspiracy. Id. at 774.
 
 
 74
 In contrast, in this action, the four-point enhancement was not based solely upon Silvas' ownership of the West Riverview residence. The evidence at trial demonstrates that Silvas was the entrepreneur of an extensive distribution operation which used the services of numerous persons.
 
 X.
 
 75
 Silvas maintains that the district court clearly erred in calculating the amount to be forfeited. At trial the Government presented evidence that Silvas had not filed a tax return nor paid taxes for 1989 or 1990, the years during which the conspiracy was in operation. Silvas made major purchases and incurred significant expenses in 1989 and 1990 totaling more than $105,000.00, including the purchase of a residence, real property, a van, and an automobile.
 
 
 76
 Viewing the record as a whole, the district court did not clearly err in ordering Silvas to forfeit $105,000.00. Ramos, 923 F.2d at 1356.
 
 
 77
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Prior to Andres Chavarria Jr.'s testimony, Silvas objected to the admissibility of all the drug ledgers found at the West Riverview residence. Initially, the court admitted the ledgers with an admonishment to the jury that the ledgers could be considered only for the limited purpose of establishing the nature of the West Riverview residence. After Andres Chavarria Jr.'s testimony, the district court informed the jury that exhibit 2 and portions of exhibit 3 could be considered for the truth of the matter asserted
 
 
 [2]
 As discussed above, the district court admitted exhibit 2, and portions of exhibit 3 for the truth of the matter asserted. Earlier in the trial, the court admitted the drug ledgers for the limited purpose of establishing the nature of the West Riverview residence. After Andres Chavarria Jr. identified exhibit 2 and certain pages of exhibit 3 as the ledgers that he kept at the request of his father, the district court admitted exhibit 2 and portions of exhibit 3 for the truth of the matter asserted
 
 
 [3]
 "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered." U.S.S.G. Sec. 3B1.1, comment. (n. 3)